May it please the Court, my name is Robert Milner, and with my colleague, Mr. Andrew Frankel, on behalf of all the appellants, we will split 15 minutes. Mr. Cameron will take two minutes on behalf of the separate appeal of U.S. Fire, and we'll reserve three minutes for rebuttal. A good plan. Let's hope it works out in practice. We'll try. I intend to address 524G issues. And also the equity jurisprudence governing third-party injunctions. Mr. Frankel will talk on the admissibility of the expert evidence and the failure of the plan proponents to carry their burden to show that the plan was fair and equitable to the appellants. Your Honor, this is a plan that turns Section 524G of the Bankruptcy Code on its head. The 524G statute was modeled on the Manville case. That was a case where there was a trust that was the centerpiece. It was funded with a majority block of stock in the reorganized debtor. It was funded with insurance rights and proceeds. And all of the claims were channeled to the trust for resolution. In this case, yes. I ask you, this is just a point of information, but who were the drafters of that 524? I've never read a statute quite as complicated, and I just wondered who were, what part of the, were they as business partners? It's not in the record, but I think that Mr. Lockwood's partner, Mr. Inselbuck,  Mr. Lockwood's in the Court today. Having said that, what I want to say is that in this case, the trust is not the centerpiece. In fact, the principal source for payment of claims here is the tort system. The claims get unleashed back into the tort system. The trust gets a minority interest in the stock of the reorganized debtor for which it overpays by a factor of four times. Insurance proceeds are very largely funneled to lawyers as administrative charges, and indeed, the prejudice to the insurers is that when we get sent back into the tort system, our contribution rights are stripped away. Now, I'd like to get to that. Counsel, this pretty much comes down to the confirmation of a plan. That's what happened in the Court. What is the standard of review at our level to test whether the plan was properly confirmed or not? Standard of review at your level for the issues that we're raising today is going to be de novo because the issues that we're raising are principally issues of law and mixed issues, applications of standards to law. Mr. Frankel will address the standard of review on the evidence issues, but I don't want to let this go without making one very important point. There was an error here at the district court level because the standard of review at the district court level of the fact findings should have been de novo, and the district court did not review at that level, and we have briefed this point with some thoroughness in our briefs. Well, as to the standard of review with respect to the law, de novo, what are you relying on, statutory language or on some leading cases, such as Dow Corning, for example, to help us get a hold of what the test is? The test is in our briefs. There's Ninth Circuit law that in general, in a bankruptcy review, the standard on issues of law will be de novo, the standard on mixed questions, application of law to fact will be de novo, and that the standard at this level on issues of fact is the clearly erroneous rule. The error, the error, and we cite a Ninth Circuit case or two on that. The error here, the error here at the district court level as to why it should be de novo there on the facts instead of clearly erroneous arises from the fact that the judicial code, section 157 and 158, the method for review is divided between those matters which a bankruptcy court can hear and determine, 157b, and those which it can only hear, 157c. 157c says as to a matter the district court, rather bankruptcy court can only hear, 157c in the last few words of that section says the standard will be on facts de novo. 157d, those that the district court, rather the bankruptcy court can hear and determine, the case law makes clear that the district court will review by clear error. The problem here, and I don't want to take too much more time on this, is that 15524g, which is enacted 10 years, 1994, after that judicial code section, puts the 524g issues beyond that which a bankruptcy court can hear and determine. It makes it very clear that unlike any other hear and determine matter where a bankruptcy court, like a claim allowance, can actually issue a judgment, this order, the 524g order, and all the findings we're talking about cannot become valid or effective until a district court, an Article III judge, issues or affirms the adjunction. Anyway, I'd like to move on to the 524g issues here. I'll have to go quickly because there's a lot. But I want to hit two very basic points, Your Honor. One, 524g says that the trust has to be funded with securities of the debtor. The word used in the statute is funded. Funded in normal parlance means you put money in. That's how you fund a trust. In this instance, the principal securities transaction was for the debtor, the organized debtor, to take a minority interest, 40 percent of its stock, worth $500,000, put it into the trust, and then take out $2 million in cash. That was insurance proceeds. That was taking money out, not putting money in. Well, but the securities were – I mean, you can't dispute that the funding of the trust comes in part from the securities of the debtor. Right. It has to be. All you're saying is it doesn't all come from. No, I'm not saying that. I'm saying the statute says that the – that the funding is whole or in part. So whatever the whole or part – and remember, in Manville, it was part securities and part insurance proceeds. But the part, that's the securities, has to be a funding. There has to be a funding in whole or in part. Here, the part, part was securities. But is there anything in the statute that says anything about whether the trust should get a good deal on the securities? Yes. It uses the word.  It uses the word funded. Where does it say anything about it? By using the word – It says funded in whole or in part by the securities of one or more of the debtors. Funding the – Which you don't dispute. It comes in part from the securities of the debtor. So I'm coming to the next part. There's nothing – I couldn't find anything in the statute that says the trust must get a good deal on the securities. I dispute that it – your word, it, Your Honor, comes in part from the securities. The securities here suck money out of that trust. And if you want to see the wisdom of the statute, just think of this, okay? Suppose in this very case the insurance proceeds going into that trust were just 20 million, not a larger number, and instead of selling worthless stock for $2 million, the trust got – priced the stock at $10 million. So the – so instead of $2 million being taken out for worthless stock, $10 million was taken out of the trust for worthless stock. You can see very clearly there. The literal wording of this statute prevents that type of thing from happening. The stock that goes into that trust is a funding. It cannot be used to suck value out. And you can't – I mean, I looked at the Bankruptcy Code and the case law, and I can't find anything that precludes a debtor from receiving payment from a trust in partial exchange for the equity which it funds the trust with. There's nothing that says that literally. Moreover, I didn't find anything here where the trust was drained of all the value after the transaction because the plant was also assigned 100 million in insurance rights. Right. But I would just come back to what I'm saying. There's another provision in the Code, 524G, which says that the contributions have to be fair and equitable, particularly to the futures. That provision means that the overall funding, stock, insurance, whatever, is going to have to be sufficient. What this particular provision is doing, if applied by its letter, is saying that that securities piece has to be putting value in the trust. It prevents a situation where worthless stock is put in the trust and then cash insurance proceeds are sucked out of the trust for the benefit, in this case, of the owners of the reorganized debtor. Does that mean we can't take into account the $100 million worth of assignments of insurance rights? It means that the way that the $100 million, it's actually more than that, of insurance is taken into account under another portion of this same 524G which says that the contribution has to be adequate, has to be fair and equitable, particularly with regard to the futures. There is another provision which says that the overall funding has to be fair, but I would suggest to you that the provision dealing with the securities should be literally applied by its terms. And I think you'll see that when I go to the next section, which is that the trust has to have a right to either own 51 percent upon effective date or a right upon specified conditions to own 51 percent, because the way that that was done here is that the reorganized debtor gave a warrant to the trust to say you can get another 11 percent because they only had 40 percent. But they gave the owners of the reorganized debtor a right, they call it the repurchase right, which says this. Any time for the next 10 years, you can take back the 40 percent of the stock and the warrant, you can take it back by just returning the purchase price, okay, plus simple interest. Counsel, you're down to about 8 minutes. I just offer that as a suggestion. I will have to get up, but what I want to say is these two provisions together, these two provisions together, if literally applied by their terms, okay, yield a situation where if there's upside in the value of that reorganized debtor, if it's a successful reorganization, if you apply these two provisions, literally that upside is supposed to go to the trust. The way this was done, the money is sucked out. On the equity jurisprudence, and I'll sit down, I would just refer you to the actual Dow Corning in vitro cases we cite. May it please the Court. Andy Frankel for USF&G, and I'm going to address the inadmissible expert testimony issue. If I have time, I'll address good faith as well. Whether the contribution bar is addressed under the Dow standards that require full compensation for enjoined claims against non-debtor third parties, or even under more general equity jurisprudence, the injunction here can't stand, because the bankruptcy court here basically found that the insurer, that the insurers would be protected by getting the full value for their contribution claims by the judgment reduction provision in the plan. The problem here, though, is that in asbestos litigation generally and plans experience in particular, over 99 percent of all claims are resolved other than by way of a final judgment. So judgment reduction is an illusory remedy. And the plan proponents, which agreed to this provision, they understood that, and that's why they agreed to it. The bankruptcy court got around that by saying, well, you're going to be effectively compensated because people are going to magically reduce their settlement demands, which would be a first in asbestos litigation, and they're going to bring less claims. They're going to abandon their claims, even though the bankruptcy court also found that the principal source of recovery here, this is page 66 of the bankruptcy court opinion, is going to be from the tort system. And the court relied entirely on the invisible testimony of the three experts, who were the plan proponents' own lawyers. Kennedy. Well, let me ask you, if you don't settle and pursue that suit and then you sue again to get contribution, that's a little bit of a burden on you, but why won't you do that if that's the way, only way you'll get it? I don't understand the question. You say 99 percent settle, but why settle? Under this plan, why do you settle? Well, first of all, over 90 percent of the cases are dismissed. So the insurers are left defending without contribution. They're dismissed and then the insurer can sue the others. It can't under this plan. That's the point. The injunction bars the insurers from getting contribution for those defense costs, which very often exceed the indemnity costs. So even though the case is dismissed, they're left without a remedy. I thought they got contribution. No, that's the point here, Your Honor. I want to go back to your expert testimony idea. District court's decision to admit expert testimony is really reviewed on an abuse of discretion basis, isn't it? We would say the improper interpretation of the Federal rules of evidence is subject to review. Hold on just a minute. You can name it what you want. I've heard it named in my court a lot of things in order to try to get around the standard of review. But the honest truth is the court who's admitting expert testimony has the right under an abuse of discretion to decide whether to let it in. Well, we think this record is this evidence was patently inadmissible. There was no methodology whatsoever. All you're really saying is, as far as I read your argument, is that the gatekeeper function of the court they refused to use. No, that's incorrect, Your Honor. Let me clarify that. We recognize that in a bench trial, the gatekeeper function is applied more flexibly. And so the court might have the discretion not to make those preliminary findings. But a bench trial is still the court in a bench trial is still bound by the rules of evidence. The problem here is that this evidence did not substantively comply with Rule 702 and the requirement that there be reliable methodology applied to the facts. These were pure subjective opinions based on no methodology. This Court's decision to do that. Are you referring to the potential conflict of interest side of it, or? I didn't even get to the conflict of interest yet. I mean, the conflict of interest here is extraordinary in terms of the direct front, but I'm not going to comment on that. Yeah, but by the same token, in a bench trial, a sitting judge is going to be able to take that into account. You can say, right. But your principal concern is whether it comes in under 702 at all. That's right, Your Honor. Under Hermannick, the Hermannick decision, which makes four. My worry about this is that, I mean, I was a district judge once. I had a gatekeeper function. I had courts of appeals who tried to undo my gatekeeper function when they didn't agree with me. Otherwise, they thought I was wonderful. It seems to me that this is the same thing we're doing here. There were declarations outlining their experience in asbestos declarations or asbestos litigation. They opined based on a methodology. It may not be one you like, and it may not be one I like. In fact, I might be dead with you on that situation, but I'm still trying to figure out why, as a circuit court, I go down and get into the district court's bailiwick and say you have no discretion on this particular issue. Because it's clear, Your Honor, there was no methodology. These were just the subjective opinions of these three self-interested lawyers. They didn't look at they didn't attempt to quantify how many claims would be dismissed or how it would have any effect on settlement values. They didn't look at any data. There was no methodology at all. The Bankruptcy Court certainly didn't cite any, which in a jury trial would be an abuse of discretion. There's none. The plan proponents have not pointed to any methodology. All they say, all they say, my last point, because I, all they say is that an expert can rely on experience, and nobody disputes that. But the teaching of Kumho-Tyer and this Court's decision, it's clear. Even experience, an expert who relies on experience has to. Roberts. You want to reserve time? You're down to a minute and a half. Thank you, Your Honor, unless Your Honors have any questions on this point. Thank you. I'll just waive this and reserve the rest of the time for rebuttal, if I may, Your Honor. Very well. All right. Reset the clock to 1.30, please. So let's make sure what we waived. Just a moment. Are you going to, can you do that? We waived your argument on the whether, what was your argument going to be about? The question was whether or not the injunction violated Section 524G1B by enjoining contribution claims for defense expenses, rather than limiting it just to claims for contribution related to damages where the trust would pay some part of the claim. All right. I just wanted to make sure. We're still trying to reset the clock. Why don't we just make it a 2? Can you do that? Thank you, Your Honor. All right. Very well. There's two minutes left for this side. Very well. Well, we've got to put them back up to 20. Counsel, you may proceed. Thank you, Your Honor. May it please the Court. My name is Stephen Sachs of the Shepherd Mullen Firm, and I'll be speaking today on behalf of all the appellees. I'd like to make four points to you today. The first one is that it's unquestioned that Congress provided the remedy for asbestos debtors, creditors, and insurers that is contained in this plan. In fact, the insurers do not question that the injunctions that are issued to protect settling insurers are available under this statute. Second, not only does this plan meet the letter of the statute, comply with all of the complicated requirements of 524G, but it does achieve the core goals of 524G. Each plan under 524G does not have to look like the Manville plan, but this plan does achieve the same core goals. Third, the bankruptcy court, and indeed the district court as well, gave this plan and the non-settling insurer's objections the most careful consideration, went on for, in fact, years in the bankruptcy court, an extended multi-day, almost two-week trial, extensive consideration in the opinion by the bankruptcy court that extends over 80 pages in the published opinion and a separate opinion dealing with all of the technical 524G issues. Counsel, go back to the second point. I need some help on whether the plan fails the substantially full compensation test, which is pretty much outlined in Dow Corning. Help me figure out whether you can pass that threshold or not. Assuming that Dow Corning is relevant here, and you certainly can dispute that, but from my preparation on this case, it seemed to me that Dow Corning is a good lodestar here. We don't think Dow Corning is relevant, Your Honor, and the reason is that it's a good lodestar. But it wasn't an asbestos case, but aren't the principles the same? They're not, because the bankruptcy code in 524G adopts a specific procedure for asbestos cases, and only in asbestos cases. And as you point out, Dow Corning was not one of those. In 524G, we have specific authorization to issue injunctions protecting, in this case, settling insurers. And certain other parties that Congress specifically outlined could receive an injunction against claims such that they could be free of all future liability. And they did that. It's clear that Congress did that in order to further the goal of settling these cases once and for all. Try to bring insurers, parent companies, subsidiaries, anybody who had a responsibility for the debtor's asbestos use into the fold if they could, they could make this contribution, and they could be freed of liability in the future. And you don't have that in the situation represented by the Dow Corning cases. And, in fact, in this circuit, even if you did, you wouldn't be able to do what Dow Corning did. This circuit has specifically rejected the idea that you could, outside of 524G, issue an injunction that protects non-settling parties – I'm sorry, that protects non-debtor parties the way that the Dow Corning did. But what about protecting the interests of the non-settling insurers? Well, and that's – the appellants today are the parties who made a choice not to settle, but to instead sit on the rights they have as issuers of insurance policies. But does the bankruptcy court have the power to cut off their rights? It does. 524G gives them that power. Where? Where? In 524G1B and 524G2B. G1D as in dog? No, I'm sorry. G1B as in boy. And 524G4A specifically provides for cutting off these kinds of contribution claims. And as I said, the insurers don't dispute that claims can be cut off. What they say is that they should get full compensation. The statute doesn't provide full compensation. In fact, what it says is that the party who is making the contribution must demonstrate that they're making a sufficient contribution that it's fair and equitable to future claimants. Now, the bankruptcy court went a step further than this. So the court doesn't have to stop here with whether the statute limits contribution rights entirely. It instead can look at what the bankruptcy court and the district court did. Here the bankruptcy court said, in order to issue any equitable injunction, I'm going to utilize the principles of equity that require that injunctions be no more harmful than necessary. And so I'm going to look to see whether this injunction is fair and equitable to these non-settling insurers. And that's why we had a trial in this case. And so the parties came forward with the evidence, the expert testimony that was discussed previously, and the court weighed and balanced that evidence to determine whether it was fair and equitable to cut off these rights. And so that was the as part of that most careful consideration that I was talking about, once the court finished that process, it concluded that 524G doesn't require this compensation, but nonetheless, I've weighed the evidence, I've determined that the court is attempting to fashion conditions that mitigate the greatest hardships of the injunction. And at the same time, the court said, I can't impose conditions that would undermine the purposes of 524G, because if the injunctions don't issue, if they're too limited or if too much compensation is required, then the purposes of 524G aren't achieved. Well, how should we measure the appropriateness, if that's the term, of the diminution of the rights of the non-settling insurers? Well, I think that what you have here is a factual record. You have an extensive decision by the bankruptcy court weighing these facts. I know, but what's the standard that we should apply? Not the technical standard of review that we spent some time on earlier. I'm talking about the principle. What principle do we bring to test whether the plan was appropriate or not? Well, I think the first principle is that you don't have any constitutional or statutory requirement of full compensation. And the second principle is, as a court of equity, does this plan do substantial justice? Is it fair and equitable to all the parties? And so applying that standard, you then have facts questions that are reviewed as a matter of clear error, and you have these legal issues I've already outlined. Well, the other side doesn't fear it's fair or equitable. Why is that wrong? Well, it's wrong because, in fact, they agree as to one class of cases. All the cases that go to trial, they admit they get adequately compensated for. What they say to the court is, well, most cases don't go to trial, because, after all, we settle some of them and others of them get dismissed. And remember, of course, they're the ones in charge of that settlement process. They can decide to settle more or they can decide to go to trial more. On the cases that are settled, the evidence that the Bankruptcy Court accepted, and it was substantial evidence, was that there was a very high likelihood that the parties negotiating a settlement, the insurers essentially on one side, the plaintiffs on the other, would take into account what would happen to them if they went to trial. And since everybody concedes that after a trial, these contribution rights would be adequately compensated, so, too, in a settlement the Bankruptcy Court found, they would also be adequately compensated. That left one further category of claims, the ones that get dismissed. Indeed, a case that gets dismissed doesn't result in a compensation that you can reduce by the amount of a contribution claim. But, first of all, the Bankruptcy Court properly found those claims were small in amount and that the number of them would be reduced as a result of this plan, so that insurers who didn't settle would face fewer claims after the plan than it did before. And what's the best case that we should look to, to test all of your theories here? Well, this case is really the first one to test the question of whether it's fair and equitable to cut off contribution claims. Sorry? There is no prior decision of a court of appeal that upholds a plan with these provisions. Each plan that has come along in the 524G context has been a little bit different. Well, okay, but give us some guideposts. Sure, this precise case hasn't come up before. We understand that. But the general principles that apply to our review of the appropriateness of the plan have to be pretty well established, do they not? Well, the guideposts certainly are, with any bankruptcy plan, does it comply with the bankruptcy code? Right. And to issue injunctions, does it comply with the provisions of the code in this case that allow injunctions and the provisions of the principles of equity? So I think that's the general guidepost. Now, this Court has spoken to some extent on 524G in its Thorpe decision last year. I would point the Court to that. Which decision? I'm sorry. Thorpe insulation. Cited in our briefs, it's at 677F3-869. The Court there said the plan allows direct actions. It allows the trust to pay out claims. It terminates appellants' ability to collect claims from settling insurers. And it says, Though 524G contemplates this kind of interference with insurers' contracts, there is no doubt that the vast changes to the insurance policies and relationships have the potential substantially to impact appellants economically. The plan is therefore not insurance neutral, and the non-settling insurers there were given standing. So the Court set out, looking at a somewhat similar plan, the idea that under those circumstances, you could affect appellants' rights, but you had to let them into court and let them challenge the plan. That's exactly what happened here. The appellants did get to challenge this plan. They did get to put on evidence. They failed to show that their rights were being harmed unduly, and the Bankruptcy Court properly found that this plan was fair and equitable to them as well as to the other parties. I hate to change the argument a little, but I would really like you to focus on why it's not error in this particular plan because the injunction does not comply with 524G. I would like you to focus on the points that Mr. Milner made regarding I-2, whether the trust is to be funded in whole or in part, and I-3, which is the trust owns or by exercise of rights granted under such plan would be entitled to own. You've heard his argument as to I-2. What's your response? I think that's a pretty good argument he made. Your Honor, this plan, first of all, the statute requires that a trust be funded in whole or in part with securities of the debtor. That's correct. And this trust is funded in, certainly in part, by those securities. For example, there's a --. I'm not worried about that. That wasn't his argument. Well, in fact, he almost admits, and not quite wanted to admit with me, but almost admits that it was funded in part. But that's not his argument. Well, what his argument tries to do is add up some amounts that indeed constitute funding and take other amounts that he says represent the trust's investment in the reorganized debtor and say that, therefore, there isn't a net funding. The problem with that argument to the --. And Mr. Milner ---- I want your response to it, because it seemed, I mean, it doesn't seem to me that it's funded in whole or in part if I add them up and it isn't funded at all. Well, it is ---- first of all, you have a security, the promissory note, whereby the reorganized debtor promises to pay the trust $250,000 over 5 years. That is defined as a security by the Bankruptcy Code. It is part of the funding for the trust. There's no question that we comply just based on the promissory note alone. If you do try to amalgamate the funding that the trust has from securities and the other things that are going on as part of this plan, you find that the merger, the purchase of this stock by the trust, enables the merger to take place, it enables a reorganized debtor to take effect that has the resources to carry on business, as the Code arguably requires, and you find that over $100 million of insurance proceeds then become available to the trust that wouldn't otherwise be available. So the net result, if you truly want to add this all together, you can't just look at individual trees, you have to look at the forest, as the district court pointed out. And once you look at the whole picture, it's undoubtedly the case that the trust is being funded by securities and by all of the other things that are coming into this plan. Well, I saw what the Bankruptcy Court said, so I wanted you to respond. Now move to I-3. Sure. Isn't it true under I-3 the Bayside owners can repurchase the shares at the original price plus 10% interest? It is true, but that doesn't mean. But I guess my next question is, why would ever anybody want to have the shares and  the shares when Bayside defaults on the note is absolutely ridiculous? Well, Your Honor, you're mixing things together a little bit, which is that there's several ways in which, in this case, where we can get 51% of the stock. Well, I understand there's many ways, but I'm just trying to figure out whether I can ever get to the point where the trust owns or in the exercise of rights would be entitled to own. I don't find out a situation where they'd want to own. Why would a trust ever want to buy out the shares of its own when the price they would have to pay would be four times the value of the shares presently? I mean, I see these two questions looming out there, and I'm trying to figure out how it ever works. Well, I think you have to start with the statute. The statute says that under specified contingencies, the trust has to be able to own 51%. It does not say the trust needs to own 51% with any unqualified right. So the specified contingencies suggest that Congress was looking to protect the trust's investment in the debtor. And so that they wanted to make sure that if the debtor wasn't able to do the things it said it was going to give the trust, the trust would have some means of coming in and protecting itself. And that's why you say specified contingencies. Here, there's a few different contingencies that can operate. One of them is that we exercise the warrant. Now, if that warrant is extremely valuable, such that the owners of the other interest in the company want to repurchase it from us, they can do that. But if it's not so valuable, or if they just don't have the means right then to repay us $2 million plus any amount we've loaned them plus interest on top, then we do exercise the warrant. We do become the 51% holder. Similarly, if they don't pay that $250,000 note, or if they violate some of the non-economic requirements of the relationship, we can exercise our default rights and become the owner of 51%. So this is the same kind of situation that's been approved in other cases as qualifying for 524G. In fact, we probably have more rights to get 51% than in most of the cases that other courts have looked at in these circumstances. There's only one case that has said in the bankruptcy court that this kind of right upon default wouldn't work. And there's other bankruptcy courts that go the other way. So there's no clear line of authority that says that a default right wouldn't be adequate, and here we even have more than a default right. I want to turn to one thing that was mentioned in the reply brief here that we should respond to, which is that the plan, we say, properly allowed insurers to settle even after the confirmation trial took place in this case. The two insurers did settle in that time period, and the non-settling insurers say that there's something wrong with that, that there wasn't evidence in the record. But in fact, if you look at the bankruptcy court's decision, the court properly anticipated that that exact thing might happen and ruled that, in fact, it was appropriate to keep the time open for settlements even after the confirmation trial. And the court applied a sliding scale, which was that to the extent that only a few insurers settled, then the effect on contribution rights was low, because there wasn't much of the insurance that indeed was getting the benefit of an injunction. As more insurers settled, then there's a greater effect on the availability of contribution claims, then there's a greater effect on contribution claims, but there's also more money in that trust. And as the money in the trust expands, the court found that there would be diminishing – there would be a diminishing number of tort claims. And so the sliding scale would operate so that non-settling insurers would get the benefit either way, and therefore, it made sense to allow insurers to continue to settle even after the trial took place in this case. Counsel, where does the Congolium case fit in your analysis here? To what extent should we pay attention to it? With respect to which point, Your Honor? Well, either the immediately prior point or the point you're making now. It has to do with the funding and the timing of the rights. Well, I don't think Congolium addresses post-trial settlements in the same way. And I don't think the insurers here have relied on it to say that we're doing something that's not permitted by 524G. So I'm at a loss to answer your question. All right. We'll just leave it that way. Thank you. Thank you very much, Your Honor. Mr. Miller, you have two minutes. We'll take a minute and a half, and Mr. Cameron would like to continue. A quick question. We heard from opposing counsel that Thorpe should be the standard. What's your response? My response is as follows. In Thorpe, there was a provision in the plan which said that if the contribution rights were cut off, tort claims went back into the tort system, and then there was also a large sum, substantial, of insurance proceeds in a trust. And what the Thorpe plan provided, Your Honors, was that if the insurers, through judgment reduction, which we do have here, did not get fully compensated for their contribution rights, then the insurers could go to the trust and get the full compensation. The Thorpe case, Your Honor, used exactly the substantial full compensation standard that Your Honors have pointed out. And so what I would say about that is that the substantial full compensation standard was the standard in Thorpe, and it should be Your Honor's standard also. Let me also talk about matters of principle, because we do need a principle here. The Dow Corning case is a case involving a third-party injunction. It's not an asbestos case. But the statute used in Dow Corning also says nothing about protecting the parties whose rights are cut off. It's Section 105. What the Court is saying is that there's a general equity principle, an equity jurisprudence on third-party injunctions, if they are permitted at all, and it's the full compensation standard. And I would add, if there's any question about this being a fundamental jurisprudential point, you can look at the Fifth Circuit decision in vitro, which is under yet another statute, Chapter 15, which says nothing about third-party injunctions. But that was a recognition of a foreign case, okay, which – and what the Court there did was find – the Bankruptcy Court found that cutting off the rights against non-party guarantors was, quote, manifestly contravenes the public policy of the United States. And the Fifth Circuit affirmed that finding, reversed – it didn't reverse. It affirmed the Bankruptcy Court's decision, said that that point could not be enforced because it so contravened the policy. Your Honor, I would point out there were some things that Mr. Sachs said that were wrong. One, there's no finding that the dismissals are insubstantial. Our expert said it was 90 – a 90 percent dismissal rate. The judge said, I did not credit that. Their alleged expert, Mr. Brayton, at page ER 910, said he thought it was a 25 percent dismissal rate. That's pretty substantial. Also, on the issue of the settlements and how that's going to be fair to us, the actual It may go either way. Their own experts did not present the type of certainty of substantial compensation if that's the standard that would be required here.  Thank you. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Noonan, O'scannlain, Smith